# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00725-CR

**Sherman Lee Houston, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT NO. 04-033-K368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## O P I N I O N

A jury convicted Sherman Houston of the offense of delivery of a controlled substance in the amount of four grams but less than two hundred grams and assessed punishment at forty-five years in prison. *See* Tex. Health & Safety Code Ann. § 481.112 (West 2003). In his first issue, Houston contends that the trial court abused its discretion by admitting extraneous evidence of two later delivery offenses. In his second and third issues, Houston challenges both his conviction and sentence, contending that he was denied the effective assistance of counsel. We affirm the district court's judgment.

## BACKGROUND

Over a period of approximately six months in 2003, the U.S. Drug Enforcement Administration ran an undercover drug operation in Taylor. Detective Gary Haston, an officer from the Williamson County Sheriff's Department, participated in the investigation as an undercover purchaser of controlled substances. In his undercover role, Detective Haston began purchasing crack cocaine from Joyce Harris. Detective Haston first met Sherman Houston through Harris on May 29, 2003. On that day, Harris used Houston's cellular phone to inform Detective Haston that she could procure an ounce of crack cocaine for him to purchase. Detective Haston agreed to meet Harris in Taylor to complete the transaction.

While en route to Taylor, Detective Haston noticed that Houston and Harris were following him in Houston's car. They followed him to a gas station in Taylor, where they all met to discuss the details of the planned crack cocaine purchase. Detective Haston testified that Houston was actively involved in these initial negotiations. Harris and Houston informed Detective Haston that the delivery would occur at another location in Taylor. When Detective Haston expressed some reservations about going to a second location, Houston persisted in trying to convince him to go through with the deal. In urging him, Houston told Detective Haston "all you've got to do is just follow me and give me the money," and "they've been buying them [crack cocaine] all day."

Harris accompanied Detective Haston in his car, and Houston followed them to the delivery location. Once they arrived, Houston pulled his car behind a parked vehicle that Detective Haston identified as belonging to the supplier of the crack cocaine. Detective Haston parked in front of the supplier's car. The car had the hood up, obscuring Detective Haston's view of the occupants.

2

Houston entered the supplier's vehicle to confer with the supplier for a few moments. Then he approached Detective Haston, saying that the source wanted the money up front. Detective Haston refused to give Houston any money until he saw the cocaine. Houston tried to talk Detective Haston into giving him the money, going back and forth between the supplier's vehicle and Detective Haston's vehicle as he tried to broker the deal.

When it became clear that the negotiations had reached a stalemate, Harris became actively involved in the transaction. She persuaded Detective Haston to give her $200. Harris took the money to the supplier's car and returned with a "cookie" of crack cocaine. Detective Haston was reluctant to pay $500, the previously negotiated price for the cookie, because he thought that it weighed less than an ounce. Houston again tried to convince Detective Haston to buy the cookie, saying that he thought it was worth $450. Ultimately, Harris negotiated a lower price of $400 for the cookie. Detective Haston gave Harris another $200, which she delivered to the supplier in his car. Upon completion of the deal, Detective Haston paid Houston and Harris $20 and $40, respectively, for their roles in the transaction.

Over Houston's objection, evidence was introduced regarding Houston's participation in two subsequent drug transactions on June 11, 2003. Detective Haston testified that he twice purchased crack cocaine from Houston and Harris on that date. Although Houston's participation in these transactions was minimal, Detective Haston testified that Houston and Harris acted as partners in the two transactions on June 11, 2003. Detective Haston testified that he paid Houston for helping to facilitate the two deals.

3

A jury found Houston guilty of the offense of delivery of a controlled substance. At the punishment phase of trial, Houston testified that he was guilty of the crime for which he had been convicted. In his testimony regarding his role in the May 29th delivery, Houston characterized himself as "just a runner." The jury assessed his punishment at forty-five years in prison.

## DISCUSSION

**Extraneous Offense Evidence**

In his first issue, Houston contends that the district court erred in admitting extraneous evidence of multiple drug deliveries on June 11, 2003. *See* Tex. R. Evid. 403, 404(b). The State responds that Houston is estopped from challenging the admission of extraneous offense evidence on appeal because he admitted that he was guilty of the current offense at the punishment phase of the trial. *See Leday v. State*, 983 S.W.2d 713, 715 (Tex. Crim. App. 1998); *McGlothlin v. State*, 896 S.W.2d 183, 189 (Tex. Crim. App. 1995); *DeGarmo v. State*, 691 S.W.2d. 657, 660-61 (Tex. Crim. App. 1985). In *DeGarmo*, the court of criminal appeals held that a defendant may not complain on appeal of an error occurring at the guilt phase of the trial when the defendant admits his guilt at the punishment phase of trial. 691 S.W.2d at 661.

In *McGlothlin*, the court of criminal appeals reaffirmed the *DeGarmo* doctrine. 896 S.W.2d at 189. The *McGlothlin* court held that under the *DeGarmo* doctrine, erroneous admission of extraneous offense evidence in the guilt phase was waived by the defendant's admission of guilt in the punishment phase. *Id*. In *McGlothlin*, the court noted the truth-seeking purpose behind the *DeGarmo* doctrine:

4

When the defendant testifies and judicially confesses to the charged offense, the purpose of the trial process has been served—the truth has been determined and the purpose of the guilt/innocence phase of the trial has been satisfied. No reversible error should occur where the defendant has satisfied the necessity of the trial process.

*Id.* at 187.

However, later decisions have blurred the seemingly bright-line rule that a defendant who admits guilt at the punishment phase waives a challenge to *any* error that might have occurred during the guilt stage of the trial. In *Leday*, the court of criminal appeals significantly restricted the *DeGarmo* doctrine, recognizing that "[w]e as a people have deliberately chosen to adopt laws which interfere with the truth-seeking function of the criminal trial." 983 S.W.2d. at 724. The court explained that the need to protect some fundamental rights outweighs the truth-seeking function of a criminal trial. *Id*. at 724-25; *see also Morrison v. State*, 845 S.W.2d 882, 884 (Tex. Crim. App. 1992) ("Due Process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function.").[1]

---

[1] The *Leday* court laid out a non-exhaustive list of errors that a defendant is not estopped from raising on appeal: (1) errors violating the Due Process Clauses of the Fifth and Fourteenth Amendments regarding the right to have guilt proved beyond a reasonable doubt; (2) errors violating the right in the Double Jeopardy Clause of the Fifth Amendment to not be subjected to a second trial even when there is clear evidence of guilt; (3) errors violating the right to refuse to testify found in the Self-Incrimination Clause of the Fifth Amendment; (4) errors violating the right found in the Due Process Clause of the Fourteenth Amendment to exclude coerced confessions; (5) errors violating the Fourth Amendment prohibition against unlawful search and seizure and illegally obtained evidence; (6) errors violating Article 5 of the Rules of Evidence regarding exclusion of privileged evidence; (7) errors violating the right to have excluded custodial interrogation statements not conforming to the requirements of the Code of Criminal Procedure art. 38.22; (8) errors violating the right to have jurors prevented from asking witnesses questions. *Leday v. State*, 983 S.W.2d 713, 725 (Tex. Crim. App. 1998). Later decisions have examined specific errors not enumerated in *Leday*, but in doing so, they have preserved the distinction between errors which relate to

*Leday* did not specifically address erroneous admission of extraneous offense evidence. However, in determining whether an error falls within an exception under *Leday*, we look to the distinction between the truth-seeking function and the fundamental rights of the accused. In *Gutierrez v. State*, this Court explained, "*Leday* requires us to determine if appellant asserts fundamental rights or guaranties, or whether the truth-finding function prevails to estop appellant from raising them." *Gutierrez v. State*, 8 S.W.3d 739, 745 (Tex. App.—Austin 1999, no pet.).

This inquiry requires us to examine the nature and purpose of rules of evidence 403 and 404(b). "Cases and commentaries interpreting the Federal Rules of Evidence are instructive in our construction of similarly worded phrases in our own rules." *Coffin v. State*, 885 S.W.2d 140, 148 n.4 (Tex. Crim. App. 1994). Texas Rules of Evidence 403 and 404(b) are virtually identical to Federal Rules of Evidence 403 and 404(b). *See* 1 Steven Goode et al., Guide to the Texas Rules of Evidence §§ 403.1, 404.1 (3d ed. 2003). In the context of Federal Rule of Evidence 404(b), the United States Supreme Court examined the history and purpose of the rule:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character . . . but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state

---

fundamental rights and guaranties and errors that only interfere with the truth-seeking function of the trial. *See*, *e.g.*, *Gutierrez v. State*, 8 S.W.3d 739, 745 (Tex. App.—Austin 1999, no pet.) (by confessing guilt at punishment phase of trial, defendant was estopped from challenging propriety of jury note-taking during trial); *Kelley v. State*, 22 S.W.3d 628, 631 (Tex. App.—Fort Worth 2000, pet. ref'd) (alleged jury charge error did not implicate defendant's fundamental rights; thus having admitted guilt at punishment phase, defendant was estopped from raising jury charge error on appeal).

may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. *The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.*

*Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (footnotes omitted and emphasis added); *see also Old Chief v. United States*, 519 U.S. 172, 181-82 (1997). Similarly, rule 403 excludes evidence that carries "a danger of unfair prejudice, confusion of the issues, or misleading the jury." Tex. R. Evid. 403; *see also Old Chief*, 519 U.S. at 182 (noting that rule 403 prejudice may occur when "evidence of convictions for prior, unrelated crimes may lead a juror to think that since the defendant already has a criminal record, an erroneous conviction would not be quite as serious as would otherwise be the case") (quoting 1 J. Strong, McCormick on Evidence 780 (4th ed. 1992)).

Our review of the rules and the case law interpreting them leads us to the conclusion that the purpose of rules 403 and 404(b) is to achieve a verdict based on relevant facts rather than through confusion of the issues, unfair prejudice, misleading the jury, or any improper inferences. At their heart, these rules serve as safeguards of the truth-seeking function.[2] Under *Leday*, a violation of these rules is the type of error that a defendant is estopped from raising on appeal if he has made a judicial confession. *See Leday*, 983 S.W.2d at 725; *Gutierrez*, 8 S.W.3d at 745.

---

[2] *See also Swidler & Berlin v. United States*, 524 U.S. 399, 411 (1998) (O'Connor, J., dissenting) ("We have long recognized that '[t]he fundamental basis upon which all rules of evidence must rest—if they are to rest upon reason—is their adaptation to the successful development of the truth.'" (quoting *Funk v. United States*, 290 U.S. 371, 381 (1933)).

Furthermore, even if Houston was not estopped from raising his evidentiary issue, the admission of evidence of the June 11 drug transactions was not erroneous. "Extraneous unadjudicated offenses may be admissible if the accused opens the door to admission of such evidence." *Beasley v. State*, 838 S.W.2d 695, 706-7 (Tex. App.—Dallas 1992, pet. ref'd). A defendant opens the door by asking a question which creates a false impression that the admission of extraneous offense evidence would correct. *See Monkhouse v. State*, 861 S.W.2d 473, 476 (Tex. App.—Texarkana 1993, no pet.). When a party opens the door, opposing counsel is permitted to present evidence to correct the mistaken impression. *Beasley*, 838 S.W.2d at 707; *see also Ortiz v. State*, 834 S.W.2d 343, 346 (Tex. Crim. App. 1992). In cross-examining Detective Haston, Houston's counsel elicited evidence that Houston dressed shabbily, drove an old car, and did not make a lot of money in the drug business. Other questioning clearly implied that Houston was only a marginal participant in the drug trade and that the May 29 transaction constituted his sole involvement in the drug business.[3]

In response, the State presented evidence that a partnership existed between Houston and Harris and that the two conspired to sell Detective Haston two ounces of crack cocaine several weeks after the initial transaction. This evidence was appropriately admitted to correct the false impression left by the defendant. *See Beasley*, 838 S.W.2d at 707. Because the evidence was properly admitted and he is estopped from challenging its admission, we overrule Houston's first issue.

---

[3] Over Houston's objection, the court permitted the State to correct the false impression: "I think it all hinges on the impression that's been created by the cross-examination. And I do think the impression was that this was his only involvement in the investigation."

**Ineffective Assistance of Counsel**

In his second and third issues, Houston contends that he was denied the effective assistance of counsel during both the guilt/innocence and punishment phases of trial. Specifically, Houston contends that his counsel was ineffective because he:

- conceded guilt for the offense of delivery of a controlled substance in his closing argument;

- did not file his requests for notice of extraneous offenses in a timely manner;

- failed to obtain a ruling on his request for notice;

- failed to object, pursuant to Rule of Evidence 403, to Detective Haston's testimony regarding Houston's statement that he had facilitated a delivery of cocaine earlier in the day before he met with Haston;

- failed to adequately prepare Houston to testify at the punishment phase; and

- failed to properly advise Houston by allowing him to plead not true to the penalty paragraphs alleged in the indictment.

We evaluate claims of ineffective assistance of counsel at both phases of a criminal trial against the standard set forth in *Strickland v. Washington*. *See* 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999) (applying *Strickland* standard). In deciding a claim of ineffective assistance of counsel, we must determine whether an attorney's performance was deficient, and if so, whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688; *Thompson*, 9 S.W.3d at 812.

Deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. Absent both showings, we cannot conclude that there has been a breakdown in the adversarial process that renders the result of a trial unreliable. *Thompson*, 9 S.W.3d at 813.

In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the range of reasonable professional assistance. *Id*. at 814. We do not speculate about an attorney's strategy. *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.); *see also Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) (courts not "required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"). We review the effectiveness of counsel in light of the totality of the representation and particular circumstances of each case. *Thompson*, 9 S.W.3d at 813.

"[A]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id*. at 814 (citing *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). The appellant bears the burden of overcoming the presumption of reasonable attorney performance and is required to prove by a preponderance of the evidence that his counsel was ineffective. *Blevins*, 18 S.W.3d at 271; *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). Therefore, the appellant must

10

produce a record from which we may discern that his attorney's performance was not based on sound trial strategy. *Blevins*, 18 S.W.3d at 271. We recognize that this burden is difficult to meet on direct appeal. In the majority of cases, the record on direct appeal is simply underdeveloped and cannot adequately reflect the failing of trial counsel. *Thompson*, 9 S.W.3d at 813-14.[4]

The record before us contains no evidence of the strategy behind trial counsel's actions or omissions. Although Houston filed a motion for new trial, the motion did not allege that his counsel was ineffective in representing him at trial. Because Houston did not obtain a hearing on the motion for new trial, there was no opportunity to develop the record to include information regarding counsel's strategy at trial. Houston has failed to present an adequate record for evaluating his claims of ineffective assistance of counsel. Based on this record, Houston cannot overcome the strong presumption that trial counsel's performance was reasonable, and we therefore overrule his second and third issues.[5]

---

[4] The court of criminal appeals has said that the record on direct appeal is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance. *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). Ineffective assistance of counsel claims may be reviewed on direct appeal only when "no reasonable trial strategy could justify the trial counsel's conduct, [thus] counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did." *Id*.

[5] Houston's claims of ineffective assistance of counsel are not completely foreclosed by our decision. The general rule forbidding an application for a writ of habeas corpus based on issues raised on direct appeal does not apply where the appellate court denies a claim of ineffective assistance of counsel based on the inadequacy of the record on direct appeal. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 272 n.8 (Tex. App.—Austin 2000, no pet.).

11

**CONCLUSION**

Having overruled all of Houston's issues, we affirm the district court's judgment.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed:　April 13, 2006

Publish

12