# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID R. SANDERS and HEATHER H.
SANDERS,

        Plaintiffs-Appellants,

v

TUMBLEWEED SALOON, INC., and PAINTER
INVESTMENTS, INC., doing business as
CHAUNCEY'S PUB,

        Defendants-Appellees,

and

SHAWN SPOHN and ZACHARY PIERCE,

        Defendants.

UNPUBLISHED
October 30, 2018

No. 338937
Montmorency Circuit Court
LC No. 16-003949-NO

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

        Plaintiffs appeal by leave granted[1] the trial court's order granting summary disposition under MCR 2.116(C)(10) in favor of the two corporate defendants, both of which are bars. Plaintiffs were dining patrons at Chauncey's Bar. David Sanders was seriously injured when the two individual defendants, Shawn Spohn and Zachary Pierce,[2] violently assaulted him after they had consumed alcohol at both bars. Relevant to the instant appeal, plaintiffs brought claims against both bars for violating the Dramshop Act, MCL 436.1801 *et seq.*, and claims against Chauncey's for negligent supervision, willful and wanton misconduct, and premises liability. The trial court granted summary disposition based on its finding that a letter written without

---

[1] *Sanders v Spohn*, unpublished order of the Court of Appeals, entered December 20, 2017 (Docket No. 338937).

[2] The individual defendants are apparently facing criminal proceedings arising out of the incident, but we have no knowledge of the details of those proceedings.

plaintiffs' knowledge or consent to one of the bars, asking the bar to preserve any evidence the bar possessed of the attack, constituted a failed attempt to provide notice under the dramshop act. We reverse and remand.

## I. FACTS

### A. The Assault

On the evening of December 2, 2014, plaintiffs David and Heather Sanders were dining at Chauncey's. Also present were defendants Shawn Spohn and Zachary Pierce, who were drinking and socializing with Michelle Sanders,[3] an off-duty employee of Chauncey's. Spohn and Pierce became boisterous. Heather opined that Pierce appeared flushed, with bloodshot eyes and slurred speech. She also stated that both Michelle and Pierce "had bottles of beer in front of them." At Michelle's suggestion, Spohn, Pierce, and Michelle left Chauncey's and walked to Tumbleweed.[4]

The bartender at Tumbleweed opined that neither Pierce nor Spohn appeared remarkable, but he only served them one shot of liquor each because they would not desist from "wrestling around." Michelle testified that she, Spohn, and Pierce were at Tumbleweed for 15 minutes. She testified that at some point during that time, Pierce vomited on the sidewalk, whereupon Michelle texted the Chauncey's bartender to say that Pierce should not be served any more alcohol if he returned to Chauncey's.

Michelle left Tumbleweed to return to Chauncey's, followed by Pierce. At Chauncey's, Pierce attempted to order another drink. The Chauncey's bartender refused and asked Pierce to leave. Pierce responded with vulgar language, but he complied. Thereafter, Spohn also returned to Chauncey's, yelling and wanting to know why he and Pierce had been "cut off." Spohn was also asked to leave. Spohn allegedly threatened to injure the bartender as well as the owner of Chauncey's, but eventually he also went outside.

At some point after Spohn and Pierce left, David went out the front door of Chauncey's. Other witnesses indicated that at that time, Spohn was in the process of damaging a car with a flagpole. When David exited the bar, Spohn kicked him in the chest. David briefly went back into Chauncey's, told Heather to call 9-1-1, and went back outside. When David came back outside, Spohn and Pierce tackled him and began kicking him in his head and neck. David suffered serious injuries.

### B. The Letter

On February 3, 2015, attorney Samuel Meklir sent a letter to Tumbleweed stating that he "represent[ed] Mr. David Sanders as a result of injuries he sustained while at the Highway Bar

---

[3] Michelle is David's former wife. Because several individuals share a last name, we will refer to them by their first names.

[4] Tumbleweed is also known as the "Highway Bar" and the "Hi Way."

which occurred on December 2, 2014" and requesting that Tumbleweed preserve any security videos in its possession. Heather testified that Meklir had been her "original lawyer" when he previously represented her in an unrelated prior lawsuit when her daughter received a birth-related injury. She testified that plaintiffs "went in to see [Meklir] to get things going and all that, but when he looked at the case it wasn't—the travel time and him taking the time up here wasn't worth [it]." David initially agreed with an inquiry whether he had "hire[d] a firm down in Southfield," but he immediately clarified that he "talked to [Meklir], but that was it." David stated that Meklir had instead referred plaintiffs to their current counsel. In an affidavit, Meklir averred that he "spoke with [plaintiffs] regarding a potential personal injury claim," and "had represented Heather on another matter years ago." Meklir further averred that following his conversation with plaintiffs, he informed them that he "would not be taking the case or representing them" and that he sent the letter to Tumbleweed "[a]s a favor." David described Meklir as "[his] wife's lawyer," and when asked about Meklir's letter at his deposition, he stated that he "ha[d] never seen that letter." Heather presumed that David had "probably" seen the letter, but she did not recall seeing it herself.

Consistent with both David's and Heather's testimonies, Meklir averred, "No retainer agreement was ever drafted or signed regarding this incident," and "[a]t no time did I ever represent [plaintiffs] regarding the personal injury claim that involved the assault on [David]." At oral argument, counsel for Chauncey's asserted that Meklir had in fact *accepted* the case and *then* decided after investigation to decline further involvement. We have not been able to find any evidence in the record, nor has any been cited to us, in support of that statement. Counsel for Chauncey's also focused on David allegedly admitting that he had hired Meklir. We note that counsel omitted David's follow up explanation and emphatic statements that he did not retain Meklir. As our dissenting colleague sets forth in detail, plaintiffs both testified that they saw and talked to Meklir but did not retain him.

## C. The Bars' Summary Disposition Motion

The bars argue that plaintiffs failed to provide them with proper and timely notice of a dramshop claim. Pursuant to MCL 436.1801(4), plaintiff was required to provide notice of a dramshop claim "within 120 days after entering an attorney-client relationship for the purpose of pursuing a claim under [the dramshop act]." The bars assert that, notwithstanding the sworn testimony to the contrary, Meklir's letter conclusively and irrebuttably establishes that plaintiffs and Meklir had entered into an attorney-client relationship by the time the letter was sent. They further argue that because the letter only addressed Tumbleweed, it could not serve as notice to Chauncey's, and because it contained no indication that plaintiffs were seeking a dramshop claim, it was not sufficient to serve as notice to Tumbleweed. The bars conclude that by the time they received notice from plaintiffs' counsel, more than 120 days had elapsed since plaintiffs first entered into "an attorney-client relationship for the purpose of pursuing a claim under [the dramshop act]." Consequently, they argue that plaintiffs' dramshop action must be dismissed. The trial court agreed.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v*

*Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the nonmoving party and grants summary disposition only when the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120.

The trial court "may not make findings of fact when deciding a summary disposition motion," and it may not grant summary disposition if "the record *leaves open an issue on which reasonable minds could differ*." *Price v Kroger Co of Mich*, 284 Mich App 496, 500; 773 NW2d 739 (2009) (emphasis added). "A court 'is not permitted to assess credibility, or to determine facts' on a motion for summary disposition." *Lima Twp v Bateson*, 302 Mich App 483, 492; 838 NW2d 898 (2013), quoting *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994), rev'd in part on other grounds *Smith v Globe Life Ins Co*, 460 Mich 446, 445 n 2; 597 NW2d 28 (1999).

The interpretation and application of statutes, rules, and legal doctrines is also reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## III.  ANALYSIS – DRAMSHOP CLAIM

### A.  Notice Required Under the Dramshop Act

The dramshop act provides, in relevant part, that "[a] retail licensee shall not directly or indirectly, individually or by a clerk, agent, or servant sell, furnish, or give alcoholic liquor to a person who is visibly intoxicated." MCL 436.1801(2). The dramshop act's notice provision, MCL 436.1801(4) provides in relevant part:

> An action under this section shall be instituted within 2 years after the injury or death. A plaintiff seeking damages under this section shall give written notice to all defendants within 120 days after entering an attorney-client relationship for the purpose of pursuing a claim under this section. Failure to give written notice within the time specified shall be grounds for dismissal of a claim as to any defendants that did not receive that notice unless sufficient information for determining that a retail licensee might be liable under this section was not known and could not reasonably have been known within the 120 days.

"[I]t is important to ensure that words in a statute not be ignored, treated as surplusage, or rendered nugatory." *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002); see also *C.G. Automation and Fixture, Inc v Autoform, Inc*, 291 Mich App 333, 338; 804 NW2d 781 (2011). MCL 436.1801(4) unambiguously requires that plaintiffs and Meklir must have *specifically* entered into "an attorney-client relationship *for the purpose of pursuing a claim under [the dramshop act]*" before the notice requirement is triggered.

### B.  Existence of an Attorney-Client Relationship

"The existence of an attorney-client relationship is a question of fact." 7 Am Jur 2d (2017), Attorneys at Law, § 137, p 221. The nature of an attorney-client relationship is that of agency. *Russell v City of Detroit*, 321 Mich App 628, 641; 909 NW2d 507 (2017); see also

*Stone v Bank of Commerce*, 174 US 412, 421-422; 19 S Ct 747; 43 L Ed 1028 (1899). "The law of Michigan is that disputes over the existence and scope of an agency relationship are properly determined as a question of fact." *Michigan Nat Bank of Detroit v Kellam*, 107 Mich App 669, 678; 309 NW2d 700 (1981). The existence of a particular attorney-client relationship "depends on the relations and mutual understanding of the parties, on what was said and done, and all the facts and circumstances of the particular undertaking." *Case v Ranney*, 174 Mich 673, 682; 140 NW 943 (1913).

"[A] unilateral act is not sufficient to create an attorney-client relationship, the attorney-client relationship being based in contract." *Scott v Green*, 140 Mich App 384, 400; 364 NW2d 709 (1985). "It is an accepted practice, particularly in an age of legal specialization, for an attorney to represent a client only as to a specific claim." *Jackson v Pollick*, 751 F Supp 132, 134 (ED Mich, 1990). Furthermore, "[c]lients consult attorneys for a wide variety of reasons," one of which is simply to obtain advice. *Swider & Berlin v United States*, 524 US 399, 407-408; 118 S Ct 2081; 141 L Ed 2d 379 (1998).

We find persuasive[5] the following observation from the Supreme Court of California:

That plaintiff [attorney] told the defendant that it would be necessary to carry out two proceedings, one to establish the fact of his stepmother's death and the other to quiet his title against his stepbrother's claim, did not result in the creation of the attorney-client relationship in view of the fact that plaintiff made it clear to defendant that he would only undertake to act for him in these matters when an agreement for his fee had been reached. . . . No attorney could safely or reasonably negotiate any fee agreement with a prospective client without some preliminary investigation of the facts of the case and a disclosure to the prospective client of the legal steps which in his judgment must be taken. If by the very fact of such investigation and disclosure the relationship of attorney and client would thereby be created, the attorney would be placed in the impossible position of becoming the prospective client's attorney while he was attempting to reach an agreement with him as to whether he should become his attorney or not. [*Setzer v Robinson*, 57 Cal 2d 213, 217; 368 P 2d 124; 18 Cal Rptr 524 (1962).]

Some discussion ensued at oral argument regarding the duty of confidentiality. Clearly, the duty of confidentiality arises immediately, but the existence of that duty does not establish an attorney-client relationship. As the Preamble to the Michigan Rules of Professional Conduct expressly states:

Most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so. But there are some duties, such as that of confidentiality under Rule 1.6,

---

[5] We appreciate that cases from other jurisdictions are not binding on us, but we may find them persuasive. See *People v Bell*, 276 Mich App 342, 349; 741 NW2d 57 (2007).

that may attach when the lawyer agrees to consider whether a client-lawyer relationship shall be established.

See also, Restatement 3d of the Law Governing Lawyers § 15(1)(a) (2000):

When a person discusses with a lawyer the possibility of their forming a client-lawyer relationship for a matter and no such relationship ensues, the lawyer must . . . not subsequently use or disclose confidential information learned in the consultation, except to the extent permitted with respect to confidential information of a client or former client . . .

Consequently, Meklir owes a duty of confidentiality to plaintiffs irrespective of whether any other relationship between them ever existed. However, an initial consultation and a modicum of preliminary research does not establish an attorney-client relationship in the absence of a true "meeting of the minds."

Our dissenting colleague correctly observes that an attorney-client relationship may be established in the absence of a *formal contract*. *Macomb Co Taxpayers Ass'n v L'Anse Creuse Pub Schools*, 455 Mich 1, 11; 564 NW2d 457 (1997). Furthermore, "every delegation of power carries with it authority to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred." *Emery v Ford*, 234 Mich 11, 28; 207 NW 856 (1926). However, "[t]he rendering of legal advice and legal services by the attorney *and the client's reliance on that advice or those services* is the benchmark of an attorney-client relationship." *Macomb Co Taxpayers Ass'n*, 455 Mich at 11 (emphasis added). In other words, even if no formal contract is required, an attorney-client relationship does not arise purely because such a relationship is contemplated. Furthermore, a purported client's surprise at an attorney having done *anything* on his behalf certainly would be relevant.[6] Imputing an attorney-client relationship merely because a *potential* client walks in the door and talks about a *potential* case would be contrary to fundamental contract and agency principles, and it would have a profound impact on the practice of law.

Here, the sworn, testimonial evidence unequivocally establishes that plaintiffs and Meklir never arrived at a "meeting of the minds" for Meklir to represent them in any way. Meklir's use of the word "represent" in his letter might reasonably be construed to the contrary. However, it might also be construed as carelessness or a unilateral act. Even if the letter can be construed as equivalent to the kind of deposition testimony that may not be disputed in an affidavit, *Dykes v William Beaumont Hosp*, 246 Mich App 471, 479-482; 633 NW2d 440 (2001), there is no prohibition against providing clarification and explanation. *Wallad v Access BIDCO, Inc*, 236 Mich App 303, 312-313; 600 NW2d 664 (1999). We appreciate that in general "a party is bound by representative admissions of counsel." *Kaufman & Payton, PC v Nikkila*, 200 Mich App 250, 257; 503 NW2d 728 (1993). However, we decline to judicially create a Catch-22 where the

---

[6] We do not believe that listening to a potential client's concerns and referring that potential client to another attorney constitutes "rendering advice" or "taking action on their behalf."

central question is whether counsel was representing the party at all.[7] Under MCR 2.116(G)(2), the trial court must consider *all* of the submitted evidence. The trial court's role is not to resolve factual questions; instead, it is obligated to view the evidence in the light most favorable to the non-moving party. *Maiden*, 461 Mich at 118-120; *Price*, 284 Mich App at 499-500. The evidence whether plaintiffs and Meklir entered into an attorney-client relationship is at the most ambiguous or completely dependent upon Meklir's and plaintiffs' credibilities, which precludes summary disposition.[8]

### C. For the Purpose of Pursuing a Claim Under the Dramshop Act

There are circumstances under which an attorney-client privilege for the purpose of pursuing a dramshop claim may be presumed in the absence of affirmative evidence to the contrary. See *Langrill v Stingers Lounge* (*Langrill II*), 471 Mich 926, 926; 689 NW2d 228 (2004). However, in every such case, there was no dispute that the plaintiffs had actually entered into attorney-client relationships for the purpose of bringing claims; the question was only as to the precise nature of the relationship, not its existence. *Langrill v Stingers Lounge* (*Langrill I*), 261 Mich App 698, 702; 683 NW2d 225 (2004); *Chambers v Midland Country Club*, 215 Mich App 573, 575-578; 546 NW2d 706 (1996); *Lautzenheiser v Jolly Bar & Grille, Inc*, 206 Mich App 67, 68-70; 520 NW2d 348 (1994). As discussed, there is little, if any, competent evidence establishing *any* attorney-client relationship in this case. No authority has been cited holding that a mere consultation necessarily implies an intended purpose to bring a particular claim. See *Swider & Berlin*, 524 US at 407-408. We decline to create any such authority.

At a summary disposition stage of proceedings, the trial court went too far in concluding that the evidence showed plaintiffs to have "enter[ed] an attorney-client relationship for the purpose of pursuing a claim under [the dramshop act]" at any time prior to their retention of present counsel. There exists a genuine question of fact regarding the very existence of a relationship, if any, between plaintiffs and Meklir. Therefore, the trial court lacked a basis for imputing any given scope of representation to Meklir, even if the letter could be construed as anything beyond an initial investigation. The trial court erred in concluding that plaintiffs' notice to the bars under MCL 436.1801(4) was untimely.

### IV. ANALYSIS – OTHER CLAIMS

The trial court also granted summary disposition as to plaintiffs' other claims against Chauncey's. The trial court did not articulate why, and we decline to speculate. Our review is de novo, and we will affirm a correct result even if arrived at for the wrong reason. *Kirl v*

---

[7] Furthermore, in *Dykes* and *Kaufman & Payton* and similar cases, the principle discussed was whether an affidavit could specifically contradict *deposition testimony*, not other evidence in general. There is otherwise nothing in MCR 2.116(G)(2) establishing a "hierarchy of evidence in summary disposition analysis."

[8] Additionally, the courts have long rejected slavishly applying talismanic meanings to words. See *In re Traub Estate*, 354 Mich 263, 278-279; 92 NW2d 480 (1958).

*Zinner*, 274 Mich 331, 336; 264 NW 391 (1936). Nevertheless, counsel for both bars expressly requested that the question of plaintiffs' remaining claims be remanded to the trial court in the event further proceedings were necessary, and we agree that the parties' remaining arguments would be better first entertained and ruled on by the trial court. Thus, we limit our interlocutory review in this matter to the reason articulated by the trial court for granting summary disposition. We hold only that the Meklir letter did not constitute fatally defective notice under the dramshop act or conclusive proof of an attorney-client relationship for the purpose of pursuing a claim under the dramshop act.

## V.  CONCLUSION

We reverse the trial court's grant of summary disposition, and we remand for further proceedings. The trial court shall afford the parties an opportunity to brief and argue the remaining issues, and it may conduct any other proceedings it deems proper. We do not retain jurisdiction. Plaintiffs, being the prevailing parties, may tax costs. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Anica Letica