[Cite as *Zingale v. Ohio Casino Control Comm.*, 2014-Ohio-4937.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101381**

**ANTHONY ZINGALE**

PLAINTIFF-APPELLANT

vs.

**OHIO CASINO CONTROL COMMISSION**

DEFENDANT-APPELLEE

**JUDGMENT:**
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-806310

**BEFORE:** Jones, J., Boyle, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** November 6, 2014

**ATTORNEY FOR APPELLANT**

John A. Izzo
Graff & McGovern, L.P.A.
604 East Rich Street
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

Mike DeWine
Ohio Attorney General

BY:   Charles Febus
Assistant Attorney General
Charitable Law Section
150 East Gay Street, 23rd Floor
Columbus, Ohio 43215

LARRY A. JONES, SR., J.:

{¶1} This case involves the revocation of plaintiff-appellant Anthony Zingale's casino gaming employee license, which stemmed from an incident where he failed to pay $1.84 for a Red Bull beverage in the employee dining room of the Horseshoe Casino. Zingale appeals the trial court's order upholding the decision of defendant-appellee, the Ohio Casino Control Commission ("Commission"), to revoke his license. For the reasons that follow, we reverse the trial court's decision and remand for a new hearing.

I. Procedural History and Facts

{¶2} In April 2012, the Commission issued Zingale a casino gaming employee license and he was hired by the newly opened Horseshoe Casino in downtown Cleveland. On October 10, 2012, Zingale was working the late shift at the high-limit table area of the casino when he took a break and walked to the employee area of the casino. It is undisputed that Zingale removed a can of Red Bull energy drink from the cooler in the employee dining room and scanned his employee ID to pay $1.84 for the drink. But Zingale then voided the sale and consumed the drink without paying for it. Zingale contends he must have inadvertently voided the sale because he thought he paid for the drink.

{¶3} In a document titled "Performance Documentation" and dated October 11, 2012, Zingale admitted to taking the Red Bull, scanning it, then voiding the sale, claiming that he was running late and "rushing back to the game."

{¶4} On October 17, 2012, Zingale again met with Horseshoe supervisors and it was at this time he was informed that he was being terminated from employment.

{¶5} On November 13, 2012, Horseshoe Casino notified the Commission that it had terminated Zingale. The Commission investigated the incident and issued a Notice of Opportunity for a Hearing ("Notice") on November 27, 2012, to let Zingale know that it intended

to take administrative action based on the results of its investigation. According to the Notice, the Commission had found that Zingale was "no longer suitable for licensure as a casino gaming employee in this state" based on its findings that Zingale (1) removed a Red Bull beverage from the cooler in the employee dining room and voided the sale in violation of the casino's employee handbook; (2) was terminated from employment on October 17, 2012; and (3) failed to notify the Commission of his termination in violation of Ohio Adm.Code 3772-8-04(A)(8) and/or (B).

{¶6} Zingale requested an administrative hearing, which took place in January 2013. At the hearing, Hannah Smith, assistant general counsel for the Commission, testified that she conducted the investigation into Zingale's termination from Horseshoe Casino. As part of her investigation, she contacted the casino's vice president of human resources and requested documentation about the incident. Smith received the October 11 and October 17 Performance Documentation documents and Zingale's signed acknowledgment that he had received a copy of the casino's employee handbook. Smith also received a DVD of the security video, which showed the October 10 incident in detail.

{¶7} Smith testified that Zingale did not notify the agency that he had been terminated from Horseshoe Casino, and "he should have updated the Commission he was no longer employed at the casino and that's why we issued a Notice of Opportunity for a Hearing."

{¶8} Mark Latham, who had known and worked with Zingale since the casino opened, testified that Zingale was an honest man, "with integrity," who was good at his job. Latham stated that Zingale knew how to deal many of the games in the casino and, in order to be asked to work at the high-limit tables Zingale worked at, one has to show that "you have exemplified the best skills with the least amount of mistakes."

{¶9} Latham testified about an incident in the same employee dining room when he forgot

to pay for a bag of potato chips. Latham's misstep was noticed by a supervisor; Latham went back and paid for the chips and was not disciplined. Latham also knew of other employees who forgot to pay for foodstuffs in the employee dining room but had not been "taken to task regarding a theft."

{¶10} Latham acknowledged that he had also received the employee handbook but did not know employees were obligated to report a termination from the casino to the Commission and there were no reporting requirements mentioned in the handbook. Latham hoped Zingale would not lose his license over a mistake because he was an excellent dealer and customers really liked him.

{¶11} Zingale testified that he was married, had four children, and went through an extensive background check, series of interviews, and months of training to earn his casino gaming employee license and job at the Horseshoe Casino.

{¶12} Zingale explained that he was at the high-limit tables on October 10, 2012, where dealers feel a lot of pressure because the bets are higher. He remembered one customer from that night who was playing three hands at a time, betting $150 per hand, and "people that play that amount of money know the game and they play fast so your mind is like a calculator * * * focused on getting the payouts right." According to Zingale, at break time, "you might leave the game, but your mind is still on the game."

{¶13} Zingale explained that employees received one 20-minute break every hour and 20 minutes. It takes five to eight minutes to walk to the employee dining room with a stop at the restroom. He always brought a small cooler to work with food and drinks. According to Zingale, most of the beverages in the employee dining room were free, but employees had to pay for Red Bull and bottled water. Zingale had another Red Bull in his cooler that night, but he

"was probably saving it for later."

{¶14} Zingale explained that he took a Red Bull from the cooler, scanned the drink at the self-service checkout, hit a button on the touch screen and then hit another button, explaining, "I think I hit void, I guess, from what I understand." Zingale knew there were surveillance cameras in the dining room.

{¶15} Zingale was unaware that he failed to pay for the Red Bull until his next shift, when he was called to his supervisor's office. His supervisors "downplayed" the incident and told him that they had never seen anyone lose his or her job over something so minor. Zingale signed a document titled "Performance Documentation," where his misconduct was noted. He offered to pay for the Red Bull then and there so he could return to his table and work, but his supervisors declined his offer. He asked twice to see the video of the incident but was not allowed to see it and did not view it until the day of the agency hearing.

{¶16} Zingale entered into evidence his 90-day employee review, which stated he had "expertise" in the speed of dealing of poker derivative games and blackjack. The review noted, "[Zingale] delights guests regularly by being genuinely friendly and having conversations with guests while still maintaining speed and accuracy."

{¶17} Zingale testified that since receiving his gaming license, he had not been: (1) charged with any crimes; (2) involved in any formal process to pay off debt; (3) served with a formal complaint in regard to delinquent taxes; (4) a defendant in litigation involving any business practices; (5) associated with any members of organized crime; or (6) been a party to any pending litigation. Zingale also presented letters from various individuals attesting to his honest and trustworthy character.

{¶18} Zingale told the hearing officer that he still wanted to work in the casino industry

and was in the middle of employee orientation at the Hollywood Casino in Columbus when he was told the casino could not hire him because his license was in the process of being revoked.

{¶19} After the hearing, the hearing examiner drafted a report and recommendation containing findings of fact and conclusions of law. The examiner concluded: (1) Zingale's conduct constituted a "failure of good behavior" for which "administrative action" against his license under R.C. 3772.04 was appropriate; (2) Zingale "failed to establish by clear and convincing evidence that his casino gaming employee license should not be subject to administrative action under R.C. 3772.04"; (3) the Commission proved by a preponderance of the evidence that Zingale failed to notify the Commission of his termination; and (4) administrative action against Zingale's license for failure to report his termination to the Commission was not appropriate. The hearing examiner recommended the Commission take "administrative action" against Zingale for his conduct because he violated the terms of the employee handbook. Zingale timely filed objections to the hearing examiner's report and recommendation. The Commission entered an order adopting the report in part and modifying it in part and determined that Zingale's casino gaming employee license should be revoked.

{¶20} Zingale appealed the Commission's revocation order to the Cuyahoga County Common Pleas Court, which, without opinion, upheld the agency decision, finding the order was supported by reliable, probative, and substantial evidence.

{¶21} Zingale appeals the trial court's decision and raises six assignments of error for our review, which will be analyzed out of order for ease of discussion.

## II. Assignments of Error

I. The lower Court abused its discretion when it failed to grant Mr. Zingale's motion for a finding in his favor due to the Commission's failure to certify a complete record of the proceeding.

II. The lower Court abused its discretion in determining the Commission's Order was supported by reliable, probative, and substantial evidence and was in accordance with law. The Order is not in accordance with law because the Hearing Officer and the Commission applied the wrong standard.

III. The lower Court abused its discretion in determining the Commission's Order was supported by reliable, probative, and substantial evidence and was in accordance with law. The Order is not in accordance with law because the Hearing Officer and the Commission failed to consider the mandatory requirements found in R.C. 3772.10(A) and Rule 3772-8-05 when deciding if Mr. Zingale should maintain his casino gaming employee license.

IV. The lower Court abused its discretion in determining the Commission's Order was supported by reliable, probative, and substantial evidence and was in accordance with law. The Order was not in accordance with law because the Hearing Officer's Report did not contain a recommendation as required by R.C. 119.09.

V. The lower Court abused its discretion in determining the Commission's Order was supported by reliable, probative, and substantial evidence and was in accordance with law. The Order was not in accordance with law because the Hearing Officer and the Commission determined R.C. 3772.10(B) was applicable in Mr. Zingale's case.

VI. The lower Court abused its discretion in determining the Commission's Order was supported by reliable, probative, and substantial evidence and was in accordance with law. The Order was not in accordance with law because the Commission did not comply with R.C. 119.09 when modifying the hearing officer's report.

### III.   Law and Analysis

**A.   Standard of Review**

{¶22} Zingale brought this appeal under R.C. 119.12. Pursuant to this statute, when a common pleas court reviews an order of an administrative agency, it must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110-111, 407 N.E.2d 1265 (1980); *see also Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280, 131 N.E.2d 390 (1955); *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570,

571, 589 N.E.2d 1303 (1992) (defining reliable, probative, and substantial evidence).

{¶23} The common pleas court's "review of the administrative record is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.'" *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207, 441 N.E.2d 584 (1st Dist.1981), quoting *Andrews* at 280. In its review, the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, but the findings of the agency are not conclusive. *Conrad* at 111.

{¶24} An appellate court's review of an administrative decision is decidedly more limited than that of a common pleas court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 614 N.E.2d 748 (1993). In *Pons*, the Ohio Supreme Court explained:

> While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion, i.e., being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for [that of an administrative agency] or a trial court. Instead, the appellate court must affirm the trial court's judgment.

*Id.* at 621.

{¶25} An appellate court does, however, have plenary review of questions of law. *Chirila v. Ohio State Chiropractic Bd.*, 145 Ohio App.3d 589, 592, 763 N.E.2d 1192 (10th Dist.2001), citing *Steinfels v. Ohio Dept. of Commerce*, 129 Ohio App.3d 800, 803, 719 N.E.2d 76 (10th Dist.1998). And R.C. 2505.01(2) defines an appeal on questions of law as "a review of a cause upon questions of law, including the weight and sufficiency of the evidence." Thus, although the appeal to this court is as to questions of law, it will necessarily involve a review of the evidence to determine whether the common pleas court applied the correct standard of review. *Brown v.*

*P&W Sandblasting & Painting Co.*, 6th Dist. Lucas No. L-88-067, 1988 Ohio App. LEXIS 4704, *5-*6 (Dec. 2, 1988).

**B. Attorney-Client Privilege**

{¶26} In the first assignment of error, Zingale contends that the trial court abused its discretion when it declined to find that the Commission failed to certify a complete copy of the administrative record. At issue is a staff memo prepared by in-house counsel for members of the Commission's board. The staff memo was reviewed in camera by the trial court, which denied Zingale's request that it be included as part of the administrative record. The staff memo has been transmitted, under seal, to this court for our review.

{¶27} R.C. 119.12 provides that the administrative agency shall prepare and certify to the trial court a complete record of proceedings in the case within 30 days of a receipt of the notice of appeal. Zingale argues that the staff memo is not covered by attorney-client privilege and should have been made part of the complete administrative record. The Commission contends that the staff memo is a privileged document that is not subject to disclosure. We agree with the Commission's position.

{¶28} "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 19, citing *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). Under the attorney-client privilege, "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Leslie* at ¶ 21, citing *Reed v. Baxter*, 134 F.3d 351, 355-356

(6th Cir.1998).

{¶29} In Ohio, courts have consistently recognized that "[r]ecords of communications between attorneys and their state-government clients pertaining to the attorneys' legal advice are excepted from disclosure under R.C. 149.43(A)(1) since the release of these records is prohibited by state law" — i.e., they are protected by this state's attorney-client privilege. *Leslie* at ¶ 24, citing *State ex rel. Thomas v. Ohio State Univ.*, 71 Ohio St.3d 245, 249, 643 N.E.2d 126 (1994). The *Leslie* court concluded that, in Ohio, the attorney-client privilege extends to government agencies consulting with in-house counsel for legal advice or assistance, even if that counsel is not an assistant attorney general. *Id.* at ¶ 43; *Brindle v. State Med. Bd. of Ohio*, 168 Ohio App.3d 485, 2006-Ohio-4364, 860 N.E.2d 1034, ¶ 25 (interpreting the Ohio Adm.Code 4731-13-34 to allow Ohio State Medical Board members to consult with in-house counsel regarding issues it must address and resolve).

{¶30} In this case, the staff memo was prepared by in-house legal counsel, for a state government client, the Commission. The staff memo contained legal advice; therefore, it is protected by attorney-client privilege and the trial court correctly excluded it from the administrative record.

{¶31} The first assignment of error is overruled.

**C. Burden of Proof**

{¶32} In the second assignment of error, Zingale argues that the trial court abused its discretion in upholding the Commission's decision, claiming that the decision was not in accordance with the applicable law because the hearing officer and the Commission applied the wrong standard. Specifically, Zingale argues that the Commission improperly shifted the initial burden to him to prove by clear and convincing evidence that he was suitable to retain his license,

when the initial burden should have been on the Commission to show that he was unsuitable. Zingale's argument also encompasses his fifth assignment of error, in which he claims that the hearing examiner improperly applied R.C. 3772.10(B) to his case.

{¶33} "[I]t is fundamental to administrative law and procedure that the party asserting the affirmative issues also bears the burden of proof." *Burroughs v. Ohio Dept. of Adm. Servs.*, 10th Dist. Franklin No. 12AP-522, 2013-Ohio-3261, ¶ 21, citing *Nucklos v. State Med. Bd.*, 10th Dist. Franklin No. 09AP-406, 2010-Ohio-2973, ¶17. The term "burden of proof" encompasses both the burden of going forward with evidence (or burden of production) and the burden of persuasion. *Chari v. Vore*, 91 Ohio St.3d 323, 326, 744 N.E.2d 763 (2001); *Xenia v. Wallace*, 37 Ohio St.3d 216, 219, 524 N.E.2d 889 (1988). "'The term "burden of production" tells a court which party must come forward with evidence to support a particular proposition, whereas "burden of persuasion" determines which party must produce sufficient evidence to convince a judge that a fact has been established.'" *State ex rel. Hardin v. Clermont Cty. Bd. of Elections*, 12th Dist. Clermont No. CA2011-05-045, 2012-Ohio-2569, 972 N.E.2d 115, ¶ 23, quoting 29 American Jurisprudence 2d, Evidence, Section 171 (2012). "The burden of persuasion never leaves the party on whom it is originally cast." 29 American Jurisprudence 2d, Evidence, at *id.* "Thus, what shifts is the burden of production rather than the actual burden of proof. The burden which rests upon the plaintiff, to establish the material averments of his or her cause of action * * * never shifts." *Hardin* at *id.,* citing 42 Ohio Jurisprudence 3d, Evidence and Witnesses, Section 84 (2012).

{¶34} Ohio Evid.R. 301 further provides:

In all civil actions and proceedings not otherwise provided for by statute enacted by the General Assembly or by these rules, a presumption imposes on the party

against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.

{¶35} Applying the foregoing to the case at bar, we note that the hearing examiner initially stated that Zingale had the burden of proof. Zingale objected, arguing that because he was already a licensee, the agency had the burden to show he was unsuitable to retain his employee casino gaming license. The attorney representing the Commission opined that he thought it unclear who had the burden, but the agency could proceed first because it was only going to offer exhibits into evidence (it was not until later in the hearing that the Commission decided to call Hannah Smith to testify). The hearing officer then stated that the Commission would present its evidence first. *See* Hearing tr. 10-11.

{¶36} The Commission argues that the hearing examiner eventually and correctly decided that it (the Commission) had the burden of proof, but the hearing examiner's report belies that claim.

{¶37} The 15-page report and recommendation is broken into several sections. Under "Applicable Law," the hearing examiner determined that R.C. 3772.10(B) applied to the matter and defined the clear and convincing standard of proof, citing authority from the Ohio Supreme Court.

{¶38} R.C. 3772.10(B) requires *applicants* for a casino gaming employee license to prove their suitability to hold the license by clear and convincing evidence. It is clear, however, that R.C. 3772.10(B) did not apply to Zingale; Zingale was not an applicant for a casino employee gaming license, he was already a license holder. He did not need to prove by clear and

convincing evidence that he was suitable to apply for a license that he already held.

**{¶39}** Further, under the section titled "Conclusions of Law," the hearing examiner determined, in part: (1) "The Commission demonstrated by a preponderance of the evidence" that Zingale's conduct in taking the Red Bull without paying for it constituted a failure of good behavior for which administrative action against Zingale's license under R.C. 3772.04 was appropriate and (2) he "failed to establish by clear and convincing evidence that his casino gaming employee license should not be subject to administrative action under R.C. 3772.04."[1]

**{¶40}** The hearing examiner recommended that "[b]ased upon the mandatory language of * * * R.C. 3772.10(B) * * * the Commission TAKE ADMINISTRATIVE ACTION against Mr. Zingale's casino gaming employee license."

**{¶41}** Thus, although the agency argued that the hearing examiner placed the burden of proof on the administrative agency, it is clear from the report and recommendation that the hearing examiner erroneously placed or shifted the burden of proof to Zingale to prove by clear and convincing evidence that his casino gaming employee license should not be subject to administrative action.

**{¶42}** As mentioned, the hearing examiner found that the agency demonstrated by a preponderance of the evidence that Zingale's conduct constituted a failure of good behavior for which administrative action was appropriate. But as the Commission noted in its Order, the applicable statutes did not allow the agency to take administrative action for "a failure of good behavior." So, the Commission, in adopting the report and recommendation in part and modifying it in part, modified Conclusion of Law No. 2, finding that R.C. Chapter 3772:

---

[1]The "preponderance of the evidence" standard of proof was not defined or further explained in the report and recommendation.

does not authorize the Commission to take administrative action for an applicant or licensee's "failure of good behavior" but his violation of the employee handbook constituted unsuitable conduct, for which administrative action is appropriate. Accordingly, the Commission modifies the Examiner's conclusion that Zingale's conduct constitutes "a failure of good behavior." Zingale failed to establish by clear and convincing evidence that he remains suitable for licensure as a casino gaming employee, as required by R.C. 3772.10.[2]

**{¶43}** In its attempt to cure the hearing examiner's finding that the Commission showed by a preponderance of the evidence that Zingale's action was a "failure of good behavior," the Commission modified Conclusion of Law No. 2 to state that "Zingale failed to establish by clear and convincing evidence that he remains suitable for licensure as a casino gaming employee, as required by R.C. 3772.10." To do so was error.

**{¶44}** Again, Zingale was not an applicant for a casino employee gaming license at the time the hearing was held. He was already an licensee. Therefore, R.C. 3772.10(B) did not apply to him and he was not obligated to show by clear and convincing evidence that he was suitable for a license. Instead, the burden was on the Commission to show that Zingale should no longer retain his casino employee gaming license.

**{¶45}** In its appellate brief, the Commission conceded that it had the burden to show that

---

[2]R.C. 3772.10(D)(1) provides, in part:

The commission shall investigate the qualifications of each applicant under this chapter before any license is issued and before any finding with regard to acts or transactions for which commission approval is required is made. The commission shall continue to observe the conduct of all licensees * * * to ensure that licenses are not issued to or held by, * * * an unqualified, disqualified, or unsuitable person * * * .

Zingale was no longer suitable to maintain his license, as opposed to Zingale having the burden to show by clear and convincing evidence he was still suitable: "While it is the applicant's burden to prove their suitability for licensure by clear and convincing evidence, it is the Commission's burden to prove by a preponderance of the evidence that a licensee is no longer suitable to maintain their license * * *. The Commission does not contend otherwise." Appellee br. 10-11.

{¶46} The Commission argues that the burden of proof was on it and points to the fact that the report and recommendation concluded that the Commission demonstrated by a preponderance of the evidence that Zingale's conduct constituted a failure of good behavior. The Commission further argues that any modification the agency made to that conclusion was related *only* to the use of the phrase "failure of good behavior." Even *if* that were the case, and based on the ambiguous wording of the Order, we are not convinced by the agency's argument; the hearing examiner still improperly shifted the burden of proof to Zingale to show by clear and convincing evidence that he remained suitable to keep his license.

{¶47} Finally, the Commission argues that any error was harmless because Zingale was not prejudiced by the error. We find this argument disingenuous. Not only was Zingale terminated from his position at Horseshoe casino, a job which by all accounts he excelled at, he lost any chance of finding employment as a casino gaming employee in Ohio because the Commission revoked his license. There is no harsher punishment the Commission can impose than revoking the very license Zingale requires in order to be employed in his chosen field.

{¶48} Therefore, we find that the report and recommendation is contrary to law and the trial court abused its discretion in finding that the Commission's Order was supported by reliable, probative, and substantial evidence.

**{¶49}** The second and fifth assignments of error are sustained.

## D. Statutory Considerations

**{¶50}** In the third assignment of error, Zingale argues that the trial court erred in adopting the Commission's decision because it failed to consider the mandatory requirements found in R.C. 3772.10(A) and Ohio Adm.Code 3772-8-05(B) when deciding whether to revoke his license.

**{¶51}** R.C. 3772.10(A) provides that "[i]n determining whether to grant or maintain the privilege of a * * * casino gaming employee, * * * the Ohio casino control commission shall consider all of the following, as applicable:

(1) The reputation, experience, and financial integrity of the applicant, its holding company, if applicable, and any other person that directly or indirectly controls the applicant;

(2) The financial ability of the applicant to purchase and maintain adequate liability and casualty insurance and to provide an adequate surety bond;

(3) The past and present compliance of the applicant and its affiliates or affiliated companies with casino-related licensing requirements in this state or any other jurisdiction, including whether the applicant has a history of noncompliance with the casino licensing requirements of any jurisdiction;

(4) If the applicant has been indicted, convicted, pleaded guilty or no contest, or forfeited bail concerning any criminal offense under the laws of any jurisdiction, either felony or misdemeanor, not including traffic violations;

(5) If the applicant has filed, or had filed against it a proceeding for bankruptcy or has ever been involved in any formal process to adjust, defer, suspend, or otherwise work out the payment of any debt;

(6) If the applicant has been served with a complaint or other notice filed with any public body regarding a payment of any tax required under federal, state, or local law that has been delinquent for one or more years;

(7) If the applicant is or has been a defendant in litigation involving its business practices;

(8) If awarding a license would undermine the public's confidence in the casino gaming industry in this state;

(9) If the applicant meets other standards for the issuance of a license that the commission adopts by rule, which shall not be arbitrary, capricious, or contradictory to the expressed provisions of this chapter.

{¶52} Ohio Adm.Code 3772-8-05(B) provides that "[i]n determining whether to grant, maintain or renew a casino gaming employee license, the commission shall evaluate and consider the following factors, in addition to those factors set forth in Chapter 3772 of the Revised Code:

(1) Whether the applicant possesses good character, honest and integrity;

(2) Whether the applicant possesses financial stability, integrity and responsibility;

(3) The criminal history of the applicant in any jurisdiction;

(4) Whether and to what extent the applicant has associated with members of organized crime and other persons of disreputable character;

(5) Whether a proceeding in bankruptcy has been filed by or against the applicant in the last ten years;

(6) Whether the applicant has been involved in any formal process to adjust, defer, suspend or otherwise resolve the payment of any debt in the last ten years;

(7) Whether the applicant has been served with a complaint or other notice filed with any public body regarding a payment of any tax required under federal, state or local law that has been delinquent for one or more years;

(8) The compliance history of the applicant with casino-related licensing requirements in this state or any other jurisdiction;

(9) Whether the applicant is a party to any currently pending litigation;

(10) The extent to which the applicant has cooperated with the agency in connection with the background investigation; and

(11) The extent to which the applicant has provided accurate and complete information as required by section 3772.131 of the Revised Code.

{¶53} Zingale claims that the Commission failed to consider these mandatory factors and, if it had, it would not have revoked Zingale's license. But the report and recommendation,

adopted by the Commission, specifically stated the recommendation was based "upon the mandatory language of R.C. 3772.10(A) * * * ." Although the report did not mention the factors in Ohio Adm.Code 3772-8-05(B), it is not clear that the hearing examiner and Commission did not also consider these provisions, many of which do not apply to Zingale and/or are the same or similar to the factors in R.C. 3772.10(A). The fact that the agency did not find these considerations persuasive does not mean that they were not considered and, absent more than Zingale's assertion that the agency did not consider the factors, this court will not reverse based on this claim.

{¶54} The third assignment of error is overruled.

## E.   R.C. 119.09

{¶55} In the fourth and sixth assignments of error, Zingale claims that the trial court erred in upholding the Commission's decision because the agency did not comply with R.C. 119.09.

{¶56} R.C. 119.09 governs the procedure of administrative adjudication hearings. Zingale claims that the Commission's order was not in accordance with law because the report and recommendation did not contain a specific   recommendation as required by R.C. 119.09.

{¶57} R.C. 119.09 provides, in part, that "[t]he referee or examiner shall submit to the agency a written report setting forth the referee's or examiner's findings of fact and conclusions of law and a recommendation of the action to be taken by the agency."

{¶58} In this case, the hearing officer recommended that the Commission take "administrative action" against Zingale's casino gaming employee license but did not indicate what action the agency should take; thereby leaving the decision to the Commission's discretion. Zingale argues that this action prejudiced him because the hearing officer was in the best position to give a recommendation to the Commission and, since the hearing officer did not recommend a

specific sanction, the agency improperly took it upon itself to impose the most serious sanction.

{¶59} R.C. 119.09 does not require a hearing officer to recommend a specific penalty. According to the Notice, "administrative action" means to "revoke, suspend, and or limit, condition, or otherwise limit [an employee's] casino gaming license and/or impose a monetary fine and/or a civil penalty." Thus, the Commission could have imposed any of those sanctions. The hearing examiner refrained from recommending a specific administrative action to take so as to leave that decision to the Commission's discretion. We decline to find that the hearing officer's decision renders the recommendation contrary to law.

{¶60} The fourth assignment of error is therefore overruled.

{¶61} In the sixth assignment of error, Zingale argues that the Commission did not comply with R.C. 119.09 when it modified the hearing officer's report and recommendation without stating its reasons in the record of its proceedings. On this point, we agree.

{¶62} R.C. 119.09 provides, in part:

The recommendation of the referee or examiner may be approved, modified, or disapproved by the agency, and the order of the agency based on such report, recommendation, transcript of testimony and evidence, or objections of the parties, and additional testimony and evidence shall have the same effect as if such hearing had been conducted by the agency. No such recommendation shall be final until confirmed and approved by the agency as indicated by the order entered on its record of proceedings, *and if the agency modifies or disapproves the recommendations of the referee or examiner it shall include in the record of its proceedings the reasons for such modification or disapproval.*

(Emphasis added.)

{¶63} Zingale argues the Commission modified the report and recommendation to recommend that his license be revoked but did not adequately state its reasons in the record. The Commission insists that it provided adequate reasons in the order revoking Zingale's license.

{¶64} The Order states, in pertinent part:

Finally, the Examiner recommended that the Commission take administrative action against Zingale's casino gaming employee license under R.C. 3772.04. In the Notice of Hearing, the Commission stated its intent to take administrative action, including revoking, suspending, and/or limiting, conditioning, or otherwise restricting Zingale's casino gaming employee license. The Commission modifies the Examiner's recommendation to clarify that the administrative action will be revocation of Zingale's license.

{¶65} Also contained in the record are the Commission's meeting minutes from April 17, 2013. The meeting minutes state:

In re: Anthony Zingale, (Case # 2012-0169), Chair Davidson made a motion to approve and adopt, with modifications recommended by staff, the recommendation of the Hearing Examiner, to revoke the casino gaming employee license. The motion was seconded by Commissioner Brown and approved.

{¶66} The Order and meeting minutes, even taken together, are insufficient to comply with the mandates of R.C. 119.09 because they lack reasons for imposing a sanction on Zingale's casino gaming employee license.

{¶67} We distinguish the instant case from the following cases. In *Bennett v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 10AP-833, 2011-Ohio-3158, ¶ 18, the court found that the Ohio State Medical Board complied with R.C. 119.09 in disapproving of a hearing examiner's

recommendation because the record contained board meeting minutes with detailed comments by board members. The meeting minutes, coupled with the board's vote, sufficiently stated the board's reasons for changing the examiner's recommendation. *Id.*

{¶68} In *Hill v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 96APE05-656, 1996 Ohio App. LEXIS 5470 (Dec. 5, 1996), the Tenth District found no due process violation when the Ohio State Medical Board voted to modify the hearing examiner's recommended 30-day suspension of the appellant's medical license. The court found that the meeting minutes were sufficient under R.C. 119.09 because it showed discussion among board members that showed they felt the recommended suspension was too lenient given the appellant's probation and current problems. *Id.* at *10.

{¶69} In *Bd. of Edn. v. Civ. Rights Comm.*, 66 Ohio St.2d 252, 421 N.E.2d 511 (1981), the Ohio Supreme Court held that where the Ohio Civil Rights Commission disapproves of its hearing examiner's recommendation but "includes in the record of its proceedings the Attorney General's objections to the examiner's report, the commission sufficiently states its reasons for disapproval of the examiner's report in the record." *Id.* at paragraph three of the syllabus; *see also Jackson v. Franklin Cty. Animal Control Dept.*, 10th Dist. Franklin No. 86AP-930, 1987 Ohio App. LEXIS 9144 (Oct. 6, 1987).

{¶70} Pursuant to R.C. 119.09, the Commission was required to state its reasons for modifying the hearing examiner's recommendation. It failed to do so, either in its order revoking Zingale's license or in its April 17, 2013 meeting minutes. Neither contained a single reason why the Commission chose to revoke Zingale's casino gaming employee license.

{¶71} Therefore, we find that the Commission did not comply with R.C. 119.09, and its decision to modify the hearing examiner's recommendation is contrary to law.

**F. Zingale's Failure to Notify the Commission of his Termination**

{¶72} Within the sixth assignment of error, Zingale also argues that the Commission erroneously modified the report and recommendation to conclude that Zingale violated his duty to inform the agency of his termination from Horseshoe Casino.

{¶73} In the report and recommendation, the hearing examiner made the following relevant Findings of Fact:

> 5.   On October 17, 2012, Mr. Zingale signed a * * * Performance Documentation document in the presence of casino supervisors in which he again admitted the violation of the employee handbook.   As a result of this admission, his employment was terminated.
>
> 6.   On November 13, 2012, * * * Horseshoe Casino Cleveland, notified the Commission that Mr. Zingale had been terminated and provided documentation concerning his separation from employment.
>
> 7.   Mr. Zingale failed to notify the Ohio Casino Control Commission that his employment had been terminated by his casino employer.
>
> 8.   The record in this case fails to show whether or how the Commission communicated to its casino gaming employee licensees a specific policy requiring them to give notice to the Commission if they were terminated by a casino employer.

The hearing examiner also made the following Conclusions of Law:

4.   The Commission proved by a preponderance of the evidence that Mr. Zingale failed to notify the Commission of his termination by his casino employer.

> 5.   Notwithstanding Conclusion of Law No. 4, above, administrative action against Mr. Zingale's casino gaming employee license under R.C. 3772.04 for his failure to report his termination is not appropriate, for the reason set forth in Finding of Fact No. 8, above.

{¶74} In the Order, the Commission modified Conclusion of Law No. 5 to find that

administrative action for Zingale's failure to report his termination to the Commission was appropriate. The Commission found that his employee application contained a duty to update clause; he had a duty to notify based on Ohio Adm.Code 3772-8-04, that he violated; and he failed to inform the Commission that "he had been terminated from the very employment for which his license was issued."

{¶75} The Commission entered Zingale's signed license application into evidence. On page 5 of 18 of the employment application, it states:

> V.   DUTY TO UPDATE INFORMATION
>
> A.   All Casino Gaming Employee applicants and licensees have a continuing duty to update changes to any of the information the applicant or licensee is required to provide or has provided to the Commission.
>
> B.   To fulfill this continuing duty to update, a Casino Gaming Employee applicant or licensee must:
>
> 1.   Submit the information about the change to the Commission in writing and no later than ten days after the change occurs; and
>
> 2.   Include the name and license number (if applicable) of the applicant or licensee.

{¶76} Question 15 on page 13 of 18 of the license application states: "Have you ever been suspended, discharged, asked to resign, or resigned by mutual agreement from any gaming-related employment position?" Thus, the agency argues, Zingale's employment application informed him that he had a continuing duty to update the agency of his employment status.

{¶77} The Commission additionally found that termination by a casino employer fell within the catchall suitability provision of Ohio Adm.Code 3772-8-04(8). Ohio Adm.Code 3772-8-04 provides:

(A) All casino gaming employee licensees and applicants must submit to the commission, in writing, the following information:

* * *

(8) Any other information that would affect the licensee's or applicant's suitability to maintain a casino gaming employee license under Chapter 3772 of the Revised Code or this chapter.

(B) All information required to be submitted under this rule must include the name and license number of the casino gaming employee licensee or applicant and be submitted within ten calendar days of the change or occurrence of the event.

**{¶78}** According to Smith, based on Ohio Adm.Code 3772-8-04(8), Zingale was required to inform the Commission that he was no longer employed at Horseshore Casino. Smith admitted that the agency had not published any document or otherwise disseminated any notice informing casinos or licensees that Ohio Adm.Code 3772-8-04 should be interpreted so as to require licensees to notify the agency if they are terminated from casino-related employment. But, Smith contended, "if you are terminated from a casino, * * * that affects your suitability and you are under a duty to update us."

**{¶79}** Both Zingale and his former coworker, Latham, testified that they were unaware of any notification duty and this requirement was not in their employee handbook. The hearing examiner also found no evidence of such requirement in the employee handbook.

1. Applicable Law

**{¶80}** In *State v. Montague*, 4th Dist. Athens No. 12CA25, 2013-Ohio-5505, ¶ 8-9, the court set forth the standard by which Ohio courts interpret administrative rules:

> Courts interpret administrative rules in the same manner as statutes. The primary goal in construing an administrative rule is to ascertain and give effect to the intent of the rule-making authority. The rule-making authority's intent "'is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law-making

body, there is no occasion to resort to other means of interpretation.'" Thus, when interpreting an administrative rule, courts first look to text of the rule, "'reading words and phrases in context and construing them according to the rules of grammar and common usage.'" If the language is plain and unambiguous, courts must apply it as written. "'The interpretation of statutes and administrative rules should follow the principle that neither is to be construed in any way other than as the words demand.'"

Moreover, related provisions must be read in pari materia. In reading statutes and administrative rules in pari materia, "court[s] must give a reasonable construction that provides the proper effect to each." "All provisions * * * bearing upon the same subject matter should be construed harmoniously unless they are irreconcilable."

(Citations omitted.)

{¶81} "[C]ourts * * * must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise, and to which the General Assembly has delegated the responsibility of implementing the legislative command." *Bernard v. Unemp. Comp. Rev. Comm.*, 136 Ohio St.3d 264, 267, 2013-Ohio-3121, 994 N.E.2d 437, citing *Swallow v. Indus. Comm.*, 36 Ohio St.3d 55, 57, 521 N.E.2d 778 (1988). A court must accordingly defer to the commission's interpretation, so long as the interpretation is reasonable. *Bernard* at *id.*; *see also Jones Metal Prods. Co. v. Walker*, 29 Ohio St.2d 173, 181, 281 N.E.2d 1 (1972) (finding that deference is afforded to an administrative agency's interpretation of its own rules and regulations if such an interpretation is consistent with statutory law and the plain language of the rule itself). Even if a statute is silent or ambiguous with respect to an issue, a court must give deference to an agency's interpretation of its own regulations if the interpretation is reasonable. *Wells Fargo Bank, N.A. v. Isaacs*, 1st Dist. Hamilton No. C-100111, 2010-Ohio-5811, ¶ 9-10, citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

2. Commission's Interpretation

**{¶82}** In this case, the relevant revised code and administrative code provisions, when read in conjunction, support a finding that the Commission's interpretation was reasonable.

**{¶83}** R.C. 3772.10(D)(1) requires the following: "[t]he commission shall continue to observe the conduct of all licensees * * * to ensure that licenses are not issued to or held by, * * * an unqualified, disqualified, or unsuitable person * * * ." Ohio Adm.Code 3772-8-04 requires a licensee to submit to the Commission, in writing within ten days of the occurrence, "any other information that would affect the licensee's or applicant's suitability to maintain a casino gaming employee license." And finally, Ohio Adm. Code 3772-22-01(D), which spells out what disciplinary action the Commission may take, states, "[a]ny key employee or casino gaming employee licensee whose employment has been terminated is subject to revocation of his or her license for any act or failure to act that occurred while employed by the casino operator, management company or holding company licensee."

**{¶84}** Taken in pari materia, the Commission could reasonably require a licensee to notify it if he or she is terminated from casino-related employment. The Commission's interpretation is reasonable and entitled to deference; this court is constrained to defer to the Commission's interpretation of the governing statutes and administrative rules. Of course, an agency that wants its licensees to follow the rules it promulgates should effectively communicate them. Ambiguous employment applications and administrative rules do not accomplish this goal.

**{¶85}** The sixth assignment of error is sustained in part.

## IV.   Conclusion

**{¶86}** Having found merit to the appeal, we reverse the decision of the trial court and remand the case to the administrative agency for a new hearing.

It is ordered that appellant recover of appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR