**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00110-CR**

_____

**JAMES EDWARD HUNTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-04-05627-CR**

_____

**MEMORANDUM OPINION**

A Montgomery County grand jury indicted James Edward Hunter for possession with intent to deliver a controlled substance, methamphetamine, in an amount greater than four grams but less than 200 grams. *See* Tex. Health & Safety Code Ann. § 481.112(d). The indictment included one felony enhancement, and the State later filed a notice of a second felony enhancement. The jury convicted Hunter of the first-degree felony offense, found both enhancements true, and assessed

1

punishment at thirty years of confinement in the Texas Department of Criminal Justice, Institutional Division. In two issues, Hunter complains the trial court erroneously admitted extraneous-offense evidence. We overrule both issues and affirm the trial court's judgment.

## I. Background

The evidence established that Deputy Trevor Potter with the Precinct 4 Constable's Office in Montgomery County worked as a "specialist on a narcotics tact unit[.]" Potter created an online Facebook alias and began communicating with Amanda Johnson. Deputy Potter explained that he created a Facebook post indicating he was looking for narcotics, and Johnson responded to the post. Deputy Potter and Johnson then began communicating about narcotics and pills. According to Potter, Johnson was trying to sell pills, but he "was looking for the harder drugs," like "methamphetamine, cocaine, heroin, Ecstasy, [and] LSD[.]" Deputy Potter contacted Johnson about obtaining methamphetamine. Johnson, in turn, contacted Hunter less than a minute later and relayed she had "a guy that wants a ball[.]"[1,2] Hunter responded to Johnson's Facebook message confirming the price of the ball. Johnson and Potter then arranged to meet at a certain location for the transaction.

---

[1] Hunter and Johnson had an intimate relationship, but Hunter did not consider Johnson his "girlfriend."

[2] The evidence established that a "ball" of methamphetamine was usually about 3.5 grams.

Potter did not have any contact with Hunter prior to the transaction, but both Hunter and Johnson arrived at the meeting location in the same vehicle with Hunter driving. Upon their arrest, officers located methamphetamine in the driver's seat where Hunter had been seated.

**A. Voir Dire**

During voir dire, the defense questioned the panel about being "in the wrong place at the wrong time." The defense asked the panel if they had ever been in the wrong place at the wrong time and if that meant they committed a crime.

**B. Defense's Opening Statement**

During opening, the defense argued that Hunter "was giving Amanda a ride to do a drug deal[,]" but there was "no evidence showing that he was the supplier of this methamphetamine." The defense argued that another individual named "James" who was "a known drug dealer," was "the dealer and not Mr. Hunter."

**C. Trial and Defense's Cross-Examination**

Deputy Potter testified that on April 16, 2019, Johnson messaged him, and between April 16 and April 18, 2019, they "were messaging back and forth… about narcotics." Potter explained that the conversation started with Johnson asking him if he knew anyone looking for "narcos," a term for "pills," and moved from there to Johnson asking Potter if he "needed work, [which] is a street term for methamphetamine." Potter testified, and Facebook records admitted at trial showed

that Johnson told him she had "bars" or Xanax, but she could get the "work" or methamphetamine, which meant she had access to someone who had methamphetamine. He explained that a "ball" was 3.5 grams of methamphetamine.

Evidence showed that Potter and Johnson discussed him purchasing methamphetamine on April 17, 2019. Likewise, the Facebook message evidence established that on the same date, within thirty seconds of Potter's request for a ball, Johnson communicated with Hunter inquiring about methamphetamine and pricing, and indicated that she had a customer who wanted "a ball." Hunter responded to Johnson that he could supply the desired amount.

Potter testified they messaged on April 18, 2019, and he asked Johnson how much for a "ball" or 3.5 grams of meth. Johnson responded and told Potter a ball will cost $80, the same price Hunter confirmed the previous day. Potter testified that Johnson noted on the way to the transaction that the dealer was "geeked out" which meant he was strung out on drugs, probably meth, and he had been up for too many days.

On the way to meet Potter, Johnson messaged him that she was supplying the "bars" or Xanax, and the guy with her was supplying the "clear," which testimony established was slang for methamphetamine. Upon identifying Johnson at the meeting location based on the description of the vehicle she provided to Potter, officers approached the vehicle and had Hunter and Johnson exit at gunpoint. Video

4

evidence of the arrest showed Hunter in the driver's seat, and testimony established officers found a baggie with a clear, rock-like substance that a DPS forensic scientist later determined to be methamphetamine weighing 4.75 grams.

At trial, the defense's line of questioning during cross-examination attempted to show that Johnson could have thrown the baggie in Hunter's seat while officers had him exit the vehicle. However, the video showed that Deputy Potter had a weapon trained on Johnson, and she already had her hands up before Hunter left the vehicle. On cross-examination, the following exchanges occurred between defense counsel and Deputy Potter:

Q. Okay. And there's certain things that dealers typically carry around with them; is that a fair statement?
A. Yes, sir.
Q. Things like baggies, right?
A. Yes, sir.
Q. Things like scales, right?
A. Yes, sir.
Q. And high-level drug dealers, I mean, ones that are dealing a lot, they are usually packing, aren't they?
A. Most of the time.
Q. Okay. Now, with regard to Mr. Hunter, you didn't find any baggies, did you?
A. No, sir.
Q. You didn't find any scales, did you?
A. No, sir.
Q. And certainly no weapons?
A. No, sir.

. . .

Q. Now, once you found out who James was, did you ever get a warrant and go search where he lived?

5

A. No, sir.
Q. So you don't know what he had there?
A. No, sir.
Q. You didn't go back there and see if he had a lab?
A. No, sir.
Q. That he had any guns?
A. No, sir.
Q. That he had any [b]aggies?
A. No, sir.
Q. That he had any scales?
A. No, sir.
Q. So how the heck do you know he's a dealer?
A. Well, from her identifying him as the one that was bringing the clear, and the clear being on his side of the car.
Q. And Amanda Johnson is a dealer in Xanax bars, right?
A. Yes, sir.

Detective Eric Prado with the Criminal Investigation Division (CID) in the Precinct 4 Montgomery County Constable's Office testified next. One of the warrants he obtained in this case was for Amanda Johnson's Facebook records. Detective Prado testified the records showed a conversation between Hunter and Johnson on April 17, 2019, where Johnson says, "I have a guy that wants a ball[.] … $80?" Prado explained Johnson was asking about the cost of the ball. Prado confirmed that Hunter responded with "Yes[.] … That's fine. I got that . . . Can you come to me?" and explained that Hunter asked if the person who wanted the ball was mobile and could pick it up. Prado also testified that Hunter confirmed he had the amount of narcotics Johnson requested. Prado testified Hunter was aware a narcotics transaction was occurring, because "[i]t confirms that he has the amount

6

which is a ball and the cost of it, he confirms on the cost. And then asks if the individual can go and get it from him."

## D. Admission of Extraneous-Offense Evidence

The evidence the State offered during Detective Prado's testimony and the trial court admitted over Appellant's objection are Hunter's text messages regarding methamphetamine transactions dating back to April 7, 2019, to unknown individuals.[3] The messages used slang for methamphetamine, units of measuring methamphetamine, and discussed pricing.

## II. Standard of Review

We review a trial court's decision on the admission of evidence under Rule 404(b) for an abuse of discretion. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "The trial court's ruling on whether extraneous-offense evidence was admissible to rebut a defensive theory should be upheld if it is within the zone of reasonable disagreement." *Dabney*, 492 S.W.3d at 318. A trial court's ruling is generally considered to fall within this zone if the evidence establishes "1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice,

---

[3] The specific references in Hunter's brief pertain to State's exhibits 22, 26, 27, and 29.

7

confusion of the issues, or misleading of the jury." *De La Paz*, 279 S.W.3d at 344. If a trial court's evidentiary ruling is correct under any applicable theory of law, we do not disturb it even if the trial judge articulates an incorrect reason for the correct ruling. *See id.*

### III. Analysis

Hunter complains regarding the admission of his text messages discussing methamphetamine sales dating back to April 7, 2019, during the guilt/innocence phase of the trial. In his first issue, Hunter complains their admission was in violation of Texas Rule of Evidence 404(b), and in his second issue, he complains the probative value of the evidence is substantially outweighed by its unfair prejudice under Rule 403.

### A. Rule 404

Generally, evidence of a crime, wrong, or other act is inadmissible to show bad character and that a defendant acted in conformity with that bad character. *See* Tex. R. Evid. 404(b)(1). However, extraneous-offense evidence may be admissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *See id.* 404(b)(2); *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). Extraneous-offense evidence is also admissible to rebut a defensive theory. *See Moses*, 105 S.W.3d at 626 n.4 (noting such evidence is often admitted to rebut a defensive theory). "A

8

defensive theory may be raised through voir dire, opening statements, or cross-examination." *Donald v. State*, 543 S.W.3d 466, 482 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Dabney*, 492 S.W.3d at 318 (opening statements and voir dire); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (opening statement); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996) (op. on reh'g) (cross-examination).

The trial court determined the defense "opened the door" to the admission of Hunter's text messages with unidentified individuals earlier in the same month as the charged crime discussing Hunter's involvement with other drug transactions. We agree. Hunter put forth at least two defensive theories: (1) that he was in the wrong place at the wrong time, specifically that he just gave Johnson a ride and Johnson was the dealer who had another supplier in this transaction instead of Hunter; and (2) that Hunter was a drug user, but not a dealer. Upon its initial cross-examination of the deputy constable, the defense attempted to elicit testimony regarding generalities and typical behaviors of drug dealers, including possessing scales, baggies, and weapons. The defense then further questioned the deputy about whether the State saw any evidence of these things and specifically asked the deputy how they knew Hunter was a dealer in the absence of these items. This line of questioning permitted the admission of the extraneous offense evidence to rebut the defensive theories that Hunter was not a drug dealer, was simply in the wrong place at the

9

wrong time, and another "James" was the methamphetamine supplier. *See Dabney*, 492 S.W.3d at 318; *Moses*, 105 S.W.3d at 626 n.4; *Ransom*, 920 S.W.2d at 301. Further, the trial court could have reasonably determined this evidence showed Hunter's knowledge and intent for being in the vehicle at the time of arrest, contrary to his assertion he was just giving Johnson a ride. Because the admission of this evidence to rebut a defensive theory fell "within the zone of reasonable disagreement[,]" we overrule this issue. *See Dabney*, 492 S.W.3d at 318.

**B. Rule 403**

Even if extraneous-offense evidence is admissible for some other purpose apart from showing character conformity, the trial court may still exclude the evidence if the probative value is substantially outweighed by the risk of unfair prejudice. *See* Tex. R. Evid. 403; *see also Moses*, 105 S.W.3d at 626. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). We perform a Rule 403 analysis balancing the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will

10

consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (footnote omitted).

As to the first two factors, the complained-of evidence directly rebutted the defensive theory that Hunter did not behave like a typical dealer nor possess typical dealer items, so he was merely a user and not a dealer. *See Garner v. State*, No. 09-15-00317-CR, 2017 WL 3298225, at *3 (Tex. App.—Beaumont Aug. 2, 2017, no pet.) (mem. op., not designated for publication) (concluding extraneous offenses were probative of whether the defendant was a drug dealer, as opposed to a mere consumer of methamphetamine). The evidence further tended to show Hunter's knowledge of drug transactions, his intent for being in the vehicle with Johnson at the time and place of the arrest, and whether he was "in the wrong place at the wrong time." To rebut the defense's theories, the State had a need for the evidence to show Hunter was more than a marginal participant in the drug trade, more than only a user, and this was not a case of mistaken identity. *See Houston v. State*, 208 S.W.3d 585, 591 (Tex. App.—Austin 2006, no pet.) (concluding extraneous offense evidence of a subsequent drug transaction was properly admitted to rebut any false impression created during defense's cross-examination that defendant was "only a marginal participant in the drug trade"). We conclude these factors weigh in favor of admission of the evidence.

Although there may have been some chance the evidence would impress the jury in some irrational way, the fact that the complained-of messages occurred less than two weeks before the drug transaction at issue and discussed the sale of methamphetamine in similar amounts, and the trial court included an instruction in the court's charge limiting the scope, the risk was likely reduced.[4] *See Majors v. State*, 554 S.W.3d 802, 809 (Tex. App.—Waco 2018, no pet.) (citing *Gamboa v. State*, 296, S.W.3d 574, 580 (Tex. Crim. App. 2009)) (presuming jury followed the trial court's instruction regarding limited purpose of evidence's admissibility and nothing in the record indicated it impressed the jury in an irrational yet indelible way). This factor weighs in favor of admissibility.

---

[4] The jury charge contained the following instruction:

You are further instructed that if there is any evidence before you in this case regarding the Defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offense or offenses, if any.

You are instructed that evidence of crimes, wrongs or acts other than what is alleged in the indictment[] is not admissible to prove the character of the Defendant in order to show action in conformity with that character, as proof he is guilty of the offenses charged in the indictment[]. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or accident of the Defendant, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or accident of the Defendant, if any, in connection with the offense alleged against him in the indictment, and for no other purpose.

12

Despite Hunter's complaint to the contrary, the evidence did not require an inordinate amount of time to develop.[5] This factor again weighs in favor of its admissibility.

On balance, we conclude there is not a "clear disparity" between the prejudicial impact of the evidence and its probative value. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (citations omitted). The trial court's admission of the text messages fell within the zone of reasonable disagreement and therefore, did not constitute an abuse of discretion. *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002) (weighing 403 factors and concluding evidence of extraneous offense was relevant and probative value not substantially outweighed by danger of unfair prejudice). We overrule this issue.

### IV. Conclusion

Having determined that the trial court did not abuse its discretion by admitting the complained-of extraneous offense evidence, we affirm the trial court's judgment.

AFFIRMED.

---

                          _____

                                CHARLES KREGER
                                       Justice

---

[5] The testimony regarding this evidence spanned approximately thirteen pages in the reporter's record.

Submitted on December 21, 2021
Opinion Delivered March 16, 2022
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.